James H. Forte (jforte@saiber.com)
Jakob B. Halpern (jhalpern@saiber.com)
**SAIBER LLC**
18 Columbia Turnpike, Suite 200
Florham Park, NJ 07932
T: (973) 622-3333
Attorneys for Plaintiff

Jonathan Moskin (jmoskin@foley.com)
Roma Patel (rlopes@foley.com)
**FOLEY & LARDNER LLP**
90 Park Ave
New York, NY 10016
Telephone: (212) 338-3572
Pro Hac Vice Counsel for Plaintiff

Kerry S. Culpepper
**CULPEPPER IP, LLC**
kculpepper@culpepperip.com
75-170 Hualalai Road, Suite B204
Kailua-Kona, Hawaii 96740
Telephone:(808) 464-4047
Pro Hac Vice Counsel for Plaintiff

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| SCREEN MEDIA VENTURES LLC, <br><br> Plaintiff, <br><br> v. <br><br> RCN TELECOM SERVICES, LLC; and RCN TELECOM SERVICES OF MASSACHUSETTS, LLC, <br><br> Defendants. | Case No.  3:23-cv-23356 <br><br> COMPLAINT FOR COPYRIGHT INFRINGEMENT AND DEMAND FOR JURY TRIAL |

Plaintiff SCREEN MEDIA VENTURES LLC ("Plaintiff" or "SMV") files this Complaint

against Defendants RCN TELECOM SERVICES, LLC and RCN TELECOM SERVICES OF

MASSACHUSETTS, LLC ("Defendants") and alleges as follows:

**Nature of the Action and Personal Jurisdiction**

1.  This matter arises under the United States Copyright Act of 1976, as amended, 17 U.S.C. §§ 101, et seq. (the "Copyright Act"), and arises from the same facts as are at issue in a parallel proceeding before this Court, Case No. 3:21-cv-15310-RK-TJB (the "Parallel Proceeding").  The claims and allegations in the Parallel Proceeding are incorporated and alleged herein by reference.

2.  As alleged in the Parallel Proceeding, Defendants are secondarily liable (under material contribution and vicarious infringement) for direct copyright infringements in violation of 17 U.S.C. §§ 106 and 501 and violations of the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1202.

3.  As alleged in the Parallel Proceeding, Defendants solicit, transact, and/or do business within this jurisdiction, and have committed unlawful and tortious acts both within and outside this jurisdiction with the full knowledge that their acts would cause injury in this jurisdiction.  As such, Defendants have sufficient contacts with this judicial district to permit the Court's exercise of personal jurisdiction over them.

4.  Upon information and belief, Defendant RCN TELECOM SERVICES, LLC is a limited liability company organized under the laws of Delaware and has its principal office at Princeton, New Jersey.

5. Upon information and belief, Defendant RCN TELECOM SERVICES OF MASSACHUSETTS, LLC is a limited liability company organized under the laws of Delaware and has its principal office at Arlington, MA.

**Parties**

6.  Plaintiff is the distributor, or otherwise has an ownership interest in, the copyrights for the motion pictures ("Works"), respectively, as shown in Exhibit "A".

7.  Plaintiff is a global independent motion picture distribution company with a network that includes U.S. and international theatrical, home video, television, cable and new media distribution, with an extensive independently owned motion picture library.

8.  Plaintiff invested significant financial resources, time and effort in marketing and distributing these motion pictures based upon the expectation that it would have an opportunity to get a return on its investment from rentals and sales. Massive piracy of these motion pictures on the Internet via peer-to-peer networks by subscribers of Internet Service Providers ("ISPs") such as Defendants and the willful failure of the ISPs to deal with this issue despite clear notice of it have hindered this opportunity.

9.  Plaintiff is a limited liability company with its principal place of business in New York, New York.

10. Defendant RCN TELECOM SERVICES, LLC is a limited liability company organized under the laws of Delaware with its principal office at Princeton, New Jersey.

11. Defendant RCN TELECOM SERVICES OF MASSACHUSETTS, LLC is, upon information and belief, a limited liability company organized under the laws of Delaware with its principal place of operation in Princeton, New Jersey.

12. Non-party RCN CORP. is, upon information and belief, a now defunct corporation previously organized under the laws of Delaware, but whose name is still used by RCN TELECOM SERVICES, LLC.

13. Upon information and belief, the Defendant RCN TELECOM SERVICES, LLC, non-party RCN CORP. and Defendant RCN TELECOM SERVICES OF MASSACHUSETTS, LLC are operated as a single, integrated company, under the RCN brand, with common management in New Jersey, a common corporate headquarters in New Jersey, and common policies and practices with respect to the provision of internet services.

14. Upon information and belief, Defendants are members of the American Registry of Internet Numbers ("ARIN"), which is a nonprofit, member-based organization that manages and distributes Internet number resources such as Internet Protocol ("IP") addresses and Autonomous System Numbers. *See* Exhibit "B".

15. Upon information and belief, Defendants have an ARIN "Org" kind handle of RTSL-6 with full name "RCN" and an address of 650 College Road East, Princeton, NJ, 08540 United States.

16. Upon information and belief, Defendants have an ARIN "Individual" kind handle of PJ301-ARIN with full name Peter Jacoby and address of 956 Massachusetts Ave., Arlington, MA 02476.

17. Upon information and belief, Defendants have an ARIN "Group" kind handle of RAD75-ARIN with full name "RCN Abuse Department", a physical address of 650 College Road East, Princeton, NJ, 08540 United States and an email address of "abuse@rcn.com".

18. Upon information and belief, Defendants have another ARIN "Group" kind handle of ZR40-ARIN with full name "RCN Corporation" and a physical address of 650 College Road East, Princeton, NJ, 08540 United States.

19. Upon information and belief, the ARIN records show that ARIN has directly allocated numerous IP address blocks to RCN, including 33 Networks and 11 Autonomous System Numbers.

20. Defendants are required to update the WHOIS records for the IP addresses it reassigns or reallocates to per its registration agreement with ARIN.

21. Upon information and belief, Defendant RCN TELECOM SERVICES OF MASSACHUSETTS, LLC is located at the address RCN publishes for its PJ301-ARIN individual handle.

22. Upon information and belief, Defendant RCN TELECOM SERVICES, LLC is located at the address RCN publishes for its ZR40-ARIN, RAD75-ARIN and RTSL-6 handles.

23. Upon information and belief, Defendant RCN TELECOM SERVICES, LLC designates Peter Jacoby as its designated DMCA agent, the same individual designated for RCN TELECOM SERVICES OF MASSACHUSETTS, LLC.

24. Defendants operate as an ISP that provides transmitting, routing, or connection for material through a system or network controlled or operated by or for Defendants.

25. Defendants advertise as one of the fastest ISPs. *See* https://www.rcn.com/, which redirects to www.astound.com [last accessed on December 22, 2023].

26. Upon information and belief, many of Defendants' subscribers are motivated to subscribe to RCN's service because it allows them to download movies and other copyrighted content— including unauthorized content—as efficiently as possible.

27. In exchange for this service, Defendants charge their subscribers monthly fees ranging in price based on the speed of service.

28. Upon information and belief, at all relevant times, Defendants knew that their subscribers routinely used their networks for illegally downloading and uploading copyrighted works, particularly Plaintiff's Works. As described below, Plaintiff's agent, together with the agent for Plaintiffs in the Parallel Proceeding, sent thousands of notices styled per 17 U.S.C. §512(c)(3) to Defendants' designated abuse contact informing Defendants that many of their subscribers were actively utilizing their service to infringe Plaintiff's Works. Those notices gave Defendants the specific identities of the infringing subscribers, referred to by their Internet Protocol ("IP") addresses, port numbers and time of infringement (to the second) and included the file title of the infringing copy being pirated that included the altered copyright management information. Nonetheless, Defendants persistently turned a blind eye to the massive infringement of Plaintiff's Works occurring over their network. Defendants allowed the illegal activity because it was popular with subscribers and acted as a draw to attract and retain new and existing subscribers. Defendants' subscribers, in turn, purchased more bandwidth and continued using Defendants' services to infringe Plaintiff's Works.

29. Upon information and belief, Defendants knew that if they terminated or otherwise prevented repeat infringer subscribers from using their service to infringe, or made it less attractive for such use, Defendants would enroll fewer new subscribers, lose existing subscribers, and ultimately lose revenue. For those account holders and subscribers who wanted to download files illegally at faster speeds, Defendants obliged them in exchange for higher rates. In other words, the greater the bandwidth their subscribers required for pirating content, the more money Defendants made.

### Joinder

30. Pursuant to Fed. R. Civ. P. 20(a)(2), each of the Defendants is properly joined because, as set forth in more detail below, Plaintiff asserts that the contributory infringements complained of herein by each of the Defendants: (a) arise out of the same transaction, occurrence, or series of transactions or occurrences, and (b) have common questions of law and fact.

31. Plaintiff asserts a right of relief against the Defendants jointly and severally.

### Subject Matter Jurisdiction and Venue

32. This Court has subject matter jurisdiction over this action pursuant to 17 U.S.C. §§ 101, et seq., (the Copyright Act), 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1338 (patents, copyrights, trademarks, and unfair competition).

33. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) - (c) because: (a) all or a substantial part of the events or omissions giving rise to the claims occurred in this District; (b) the Defendants can or could be found in this District; and/or (c) Defendants are subject to the court's personal jurisdiction with respect to the present action.  Additionally, venue is proper in this District pursuant 28 U.S.C. § 1400(a) (venue for copyright cases), because the Defendants or Defendants' agents reside and can be found in this District.

### Factual Background

**A) Plaintiff's Copyrighted Works**

34. Attached hereto as Exhibit "C" is the Second Amended Complaint in the Parallel Proceeding.  Plaintiffs repeat and reallege the allegations therein as if fully set forth herein.

35. Plaintiff has an ownership interest in the copyrights in the Works as shown in Exhibit "A" either through work for hire agreement, assignments and/or mergers.  The Works are the subjects of copyright registrations, and this action is brought pursuant to 17 U.S.C. § 411.

36. The Works are motion pictures currently offered for sale in commerce.

37. Defendants had notice of Plaintiff's rights through at least the credits indicated in the content of the motion pictures which bore proper copyright notices.

38. Defendants also had notice of Plaintiff's rights through general publication and advertising associated with the motion pictures, and packaging and copies, each of which bore a proper copyright notice.

39. Defendants also had notice of Plaintiff's rights through notices that were sent to Defendants' abuse contact.

**B) Defendants' Subscribers Infringe Plaintiff's Copyrighted Works**

40. Defendants' subscribers and/or the subscribers' household members, guests and other users (authorized or unauthorized by the subscriber) use software such as BitTorrent to infringe Plaintiff's exclusive rights of reproduction and distribution.

41. Defendant holds its subscribers responsible for all activity conducted on subscribers' Internet service.

42. Defendants' Internet Access Agreement states, "Please be advised that the contact person or listed owner of the RCN Internet Account is solely responsible for activities conducted through, on or with their RCN Internet Account, including activities by other persons (including minors) whether or not authorized by such contact person or listed owner." *See* cn.com/hub/about-rcn/policies-and-disclaimers/internet-access-agreement/, which redirects to, https://www.astound.com/policies-disclaimers/internet-access-agreement/ [last accessed December 22, 2023].

43. BitTorrent is one of the most common peer-to-peer file sharing protocols (in other words, set of computer rules) used for distributing large amounts of data.

44. The BitTorrent protocol's popularity stems from its ability to distribute a large file without creating a heavy load on the source computer and network. In short, to reduce the load on the source computer, rather than downloading a file from a single source computer (one computer directly connected to another), the BitTorrent protocol allows users to join a "swarm" of host computers to download and upload from each other simultaneously (one computer connected to numerous computers).

45. In a report from January 2011, a survey conducted by the firm Envisional estimated that 11.4 percent of all Internet traffic involved the unauthorized distribution of non-pornographic copyrighted content via BitTorrent. *See* Envisional, "Technical report: An Estimate of Infringing Use of the Internet", January 2011, https://www.ics.uci.edu/~sjordan/courses/ics11/case_studies/Envisional-Internet_Usage-Jan2011-4.pdf [last accessed December 22, 2023].

46. A more recent study by Sandvine determined that file-sharing accounts for 3 percent of global downstream and 22 percent of upstream traffic, with 97% of that traffic in turn being BitTorrent. *See* Sandvine, "The Global Internet Phenomena Report", October 2018, https://www.sandvine.com/hubfs/downloads/phenomena/2018-phenomena-report.pdf [last accessed on December 22, 2023].

47. BitTorrent is overwhelmingly used for piracy. *See* David Price, "NetNames Piracy Analysis: Sizing the Piracy Universe", September 2013, pg. 18, http://creativefuture.org/wp-content/uploads/2016/01/netnames-sizing_piracy_universe-FULLreport-sept2013.pdf [last accessed on December 22, 2023] ("Of all unique visitors to bittorrent portals in January 2013, it is estimated that 96.28% sought infringing content during the month…")

**1) The Initial Seed, Torrent, Hash and Tracker**

48. A BitTorrent user that wants to upload the new file, known as an "initial seeder," starts by creating a "torrent" descriptor file using, for example, the Client he or she installed on to his or her computer.

49. The initial user or seeder of a file used a process referred to as "ripping" to create a copy of motion pictures from either Blu-ray or legal streaming services.

50. The initial seeder often modifies the file title of the Work to include a wording such as "FGT", "RARBG" or "YTS" in the title of the torrent files and file copies to enhance a reputation for the quality of his or her torrent files and attract users to his or her piracy website.

51. The Client takes the target computer file, the "initial seed," here the copyrighted Work, and divides it into identically sized groups of bits known as "pieces."

52. The Client then gives each one of the computer file's pieces, in this case, pieces of the copyrighted Works, a random and unique alphanumeric identifier known as a "hash" and records these hash identifiers in the torrent file.

53. When another peer later receives a particular piece, the hash identifier for that piece is compared to the hash identifier recorded in the torrent file for that piece to test that the piece is error-free. In this way, the hash identifier works like an electronic fingerprint to identify the source and origin of the piece and that the piece is authentic and uncorrupted.

54. Torrent files also have an "announce" section, which specifies the URL (Uniform Resource Locator) of a "tracker," and an "info" section, containing (suggested) names for the files, their lengths, the piece length used, and the hash identifier for each piece, all of which are used by Clients on peer computers to verify the integrity of the data they receive.

55. The "tracker" is a computer or set of computers that a torrent file specifies and to which the torrent file provides peers with the URL address(es).

56. The tracker computer or computers direct a peer user's computer to other peer user's computers that have particular pieces of the file, here the copyrighted Work, on them and facilitates the exchange of data among the computers.

57. Depending on the BitTorrent Client, a tracker can either be a dedicated computer (centralized tracking) or each peer can act as a tracker (decentralized tracking.)

**2) Torrent Sites**

58. "Torrent sites" are websites that index torrent files that are currently being made available for copying and distribution by people using the BitTorrent protocol.  There are numerous torrent websites including the notorious YTS, The Pirate Bay and RARBG websites.  These websites were noted by the Office of the United States Trade Representative ("USTR") as examples of Notorious Markets defined as an online marketplace reportedly engaged in and facilitating substantial piracy. *See e.g.*, USTR, 2014 Out-of-Cycle Review of Notorious Markets, Mar. 5, 2015, pg. 17, Available at https://ustr.gov/sites/default/files/2014%20Notorious%20Markets%20List%20-%20Published_0.pdf [last accessed on December 22, 2023]; *see also* USTR, 2018 Out-of-Cycle Review of Notorious Markets, April 2019, pgs. 24, 27-28, Available at https://ustr.gov/sites/default/files/2018_Notorious_Markets_List.pdf [accessed on December 22, 2023].

**3) Defendants' subscribers access torrent sites from IP addresses provided by Defendants**

59. Upon information and belief, Defendants' subscribers accessed torrent sites including the YTS website to upload and download Plaintiff's copyrighted Work from IP addresses provided

by Defendants.

### 4) Uploading and Downloading a Work Through a BitTorrent Swarm

60. Once the initial seeder has created a torrent and uploaded it onto one or more torrent sites, then other peers begin to download and upload the computer file to which the torrent is linked (here the copyrighted Work) using the BitTorrent protocol and BitTorrent Client that the peers installed on their computers.

61. The BitTorrent protocol causes the initial seeder's computer to send different pieces of the computer file, here the copyrighted Work, to the peers seeking to download the computer file. Defendants transmit the pieces to the peers.

62. Once a peer receives a piece of the computer file, here a piece of the copyrighted Work, it starts transmitting that piece to the other peers.  Defendants transmit the pieces to the peers.

63. In this way, the peers and seeders are working together in what is called a "swarm."

64. Here, the Defendants' subscribers participated in a swarm and directly interacted and communicated with other members of the swarm through digital handshakes, the passing along of computer instructions, uploading and downloading, and by other types of transmissions, Plaintiff's Works.

65. Defendants distributed the subscribers' transmissions to other members of the swarm.

66. In this way, and by way of example only, one initial seeder can create a torrent that breaks a movie up into hundreds or thousands of pieces saved in the form of a computer file, like the Works here, upload the torrent onto a torrent site, and deliver a different piece of the copyrighted Work to each of the peers. The recipient peers then automatically begin delivering the piece they just received to the other peers in the same swarm.

67. Once a peer has downloaded the full file, the BitTorrent Client reassembles the pieces and the peer is able to view the movie. Also, once a peer has downloaded the full file, that peer becomes known as "an additional seed," because it continues to distribute the torrent file, here the copyrighted Work.

**5) Plaintiff's computer investigator identified Defendants' IP addresses as participants in swarms that were distributing Plaintiff's copyrighted Works**

68. Plaintiff engaged Facterra LLC ("Facterrra") and/or Irdeto to monitor the Internet for instances of piracy of its Works.

69. Facterra identified IP addresses belonging to Defendants' subscribers that are being used to undertake the BitTorrent protocol to reproduce, distribute, display or perform SMV's copyrighted Works.

70. Upon information and belief, between August 13, 2018 and present, Facterra identified over 60,000 instances of sharing copies of Plaintiff's copyrighted works, including without limitation over 25,000 instances of the Works identified herein in Exhibit "A", that were confirmed at IP addresses belonging to Defendant's subscribers.

71. Similarly, as alleged in the Parallel Proceeding, and demonstrating the extent of the unlawful file-sharing on Defendants platforms, Maverickeye UG ("MEU") monitored the Internet for instances of piracy of copyright protected works owned by Plaintiffs in the Parallel Proceeding. MEU logged information including the IP addresses, Unique Hash Numbers, and hit dates that show that Defendants' subscribers distributed pieces of the copyrighted works of Plaintiffs in the Parallel Proceeding identified by the Unique Hash Number.

**C) Defendants' Subscribers Distributed Copies of Plaintiff's Works**

72. Defendants' subscribers distributed at least pieces of each of Plaintiff's Works over network connections provided by Defendants to other peers.

73. Defendants' subscriber at IP address 108.176.64.58 distributed hundreds of copies of Plaintiff's Work *Scarecrow* under the file name "Scarecrow (2013) [x284 Super 480p] – Joker_RETURNS" and "Scarecrow.2013.1080p.BluRay.x264-SONiDO [PublicHD].

74. Defendant's subscribers at IP addresses 207.237.223.154, 208.105.58.254, and 208.58.223.193, among others, distributed hundreds of copies of Plaintiff's Work *The Locksmith*.

75. Defendant's subscribers at IP addresses 131.106.165.223 and 131.106.17.168, among others, distributed hundreds of copies of Plaintiff's Work *Jeepers Creepers: Reborn.*

**D) Defendants' subscribers knew the Copyright Management Information included in the files they distributed to other peers had been removed or altered without the authority of Plaintiff**

76. A legitimate file copy of each of the Works includes copyright management information ("CMI") indicating the title.

77. The initial seeders of the infringing file copies of Plaintiff's Works added wording to the file titles to "brand" the quality of piracy files he or she released and attract further traffic to his or her website.

78. For example, the initial seeder of the infringing file copies of the Work *The Locksmith* added the wording "RARBG" to the file title to brand the quality of piracy file and attract further traffic to the RARBG website.

79. The word RARBG is not included in the file title of legitimate copies or streams of the Works. The initial seeder of the Work altered the title to falsely include the words "RARBG" in the CMI.

80. The initial seeder of the infringing file copies of the *Jeepers Creepers: Reborn* added the wording "YTS" to the file titles to brand the quality of piracy files he or she released and attract further traffic to the YTS website.

81. The word YTS is not included in the file title of legitimate copies or streams of the Works. The initial seeder of the Work altered the title to falsely include the words "YTS" in the CMI.

82. The file copies Defendants' subscribers distributed to other peers in the Swarm included the altered CMI in the file title.

83. Defendants' subscribers knew that the website or BitTorrent Client from which they obtained their torrent files was distributing illegal copies of the Work.

84. In many cases, Defendants' subscribers had registered accounts with these piracy websites.

85. Defendants' subscribers knew that the entity included in the false or altered CMI such as YTS or RARBG was not the author of Plaintiff's Works.

86. Defendants' subscribers knew that the entity included in the false or altered CMI such as YTS or RARBG was not a licensed distributor of Plaintiff's Works. Indeed, the YTS website includes a warning to this effect.

87. Defendants' subscribers knew that the false or altered CMI that included words such as YTS and RARBG in the file names was false.

88. Defendants' subscribers knew that the false or altered CMI in the titles would induce, enable, facility or conceal infringements of the Works when they distributed the false CMI, altered CMI or the Work including the false or altered CMI.

89. Namely, Defendants' subscribers knew that other recipients would see the file titles and use the altered CMI to go to the website such as YTS from where the torrent files originated to obtained unlicensed copies of the Work.

90. By providing the altered CMI to others, Defendants' subscribers induced, enabled and facilitated further infringements of the Work.

91. Defendants' subscribers distributed Plaintiff's Works with altered CMI.

**E) Defendants had Knowledge that Their Subscribers were Infringing Plaintiff's Works and Distributing File Copies of the Works with altered CMI But Continued to Provide Service to Their Subscribers**

92. Plaintiff's agents generated Notices of infringements ("Notices") styled per 17 U.S.C. §512©(3) of the Digital Millennium Copyright Act ("DMCA") to be sent to service providers of IP addresses where Plaintiff's agent confirmed infringement of copyright protected content.

93. Each Notice included at least the name of the copyright owner, the title of the Work, the manner by which it was infringed, the infringing file name which includes the altered Copyright Management Information, the IP address and port number at where infringement was confirmed and the time of infringement down to the second.

94. Similarly, in the Parallel Proceeding, and demonstrating the extent of Defendants knowledge of unlawful file sharing on their platforms, MEU generated thousands of Notices to be sent to service providers of IP addresses with confirmed infringement of copyright protected content belonging to plaintiffs in the Parallel Proceeding. …

95. Plaintiff's agent determines the proper service provider assigned the IP addresses at issue from publicly available information from ARIN.

96. Plaintiff's agent determines the proper abuse contact email address for the service provider assigned the IP addresses from the ARIN records, DMCA designated directory and Defendants' website.

**DMCA Designated Agent Directory**

| Service Provider History: | Effective: December 9, 2020 to Present (Active) | ⌄ |
|---|---|---|

| **Service Provider/Designated Agent Information** | |
|---|---|
| Service Provider: | RCN Telecom Services LLC<br>650 College Road East<br>Suite 3100<br>Princeton, NJ 08540 |
| Designated Agent: | DMCA Manager<br>RCN Telecom Services LLC<br>956 Massachusetts Avenue<br>Arlington, MA 02476<br>Phone: 781.316.8815<br>Email: abuse@rcn.net |
| Status: | Active |
| Effective: | December 9, 2020 to Present |

97.  Plaintiff's agent sends the Notice to the abuse contact email address.

98.  Defendants are required to update the WHOIS records for the IP addresses it reassigns or reallocates per their registration agreement with ARIN.

99.  Plaintiff's agent has sent numerous Notices to Defendants concerning infringements of copyright protected Works including Plaintiff's at IP addresses assigned to Defendants from ARIN.

100. Likewise, as alleged in the Parallel Proceeding, and demonstrating the extent of Defendants' knowledge of, agents of plaintiffs in the Parallel Proceeding sent over 1,700 Notices concerning infringement of the motion picture *Angel Has Fallen,* 1,400 Notices concerning infringement of the motion picture *Rambo V: Last Blood,* and 300 Notices to Defendants concerning infringement of the motion picture *Ava*, all at IP addresses assigned to Defendants from ARIN.

101. Upon information and belief, for example, Irdeto sent over 40 Notices to Defendants concerning infringement of the motion picture *Jeepers Creepers: Reborn* at IP addresses assigned to Defendants from ARIN.

102. Upon information and belief, for example, Irdeto sent over 10 Notices to Defendants concerning infringement of the motion picture *Code Name Banshee* at IP addresses assigned to Defendants from ARIN

103. Upon information and belief, for example, Irdeto sent over 30 Notices to Defendants concerning infringement of the motion picture *The Locksmith* at IP addresses assigned to Defendants from ARIN.

104. Upon information and belief, for example, Irdeto sent over 200 Notices to Defendants concerning infringement of the motion picture *Willy's Wonderland* at IP addresses assigned to Defendants from ARIN.

105. Upon information and belief, for example, Irdeto sent over 100 Notices to Defendants concerning infringement of the motion picture *Till Death* at IP addresses assigned to Defendants from ARIN.

106. Upon information and belief, other rightsholders had similar Notices sent to Defendants concerning infringing activity at IP addresses assigned to Defendants from ARIN with altered CMI.

107. Defendants failed to terminate the subscribers of the accounts associated with these IP addresses or take any meaningful action in response to these Notices.

108. Defendants often failed to even forward the Notices to their subscribers.

109. Defendants continued to provide service to their subscribers despite knowledge that their subscribers were using the service to engage and facilitate massive piracy of Plaintiff's copyright protected Works.

110. Defendants' failure to terminate or take any meaningful action against their subscribers resulted in a cascade of piracy of Plaintiff's Works.

**F) Defendants Control the Conduct of Their Subscribers.**

111. Defendants can terminate the accounts of their subscribers at any time.

112. Upon information and belief, Defendants promptly terminate subscriber accounts for committing any prohibited or abusive activities or failing to pay for the service. *See e.g.*, https://www.astound.com/policies-disclaimers/acceptable-use-

policy/#:~:text=In%20the%20event%20that%20RCN,i)%20reserves%20the%20right%20to   [last accessed December 22, 2023].

113. Indeed, Defendants explicitly state that they have the right to disconnect or temporarily suspend a subscriber's account, including for DMCA violations. *See e.g*, https://www.astound.com/policies-disclaimers/dmca/ [last accessed December 22, 2023].

114. Yet, upon information and belief, Defendants have failed to actually act on these purported policies..

115. Upon information and belief, Defendants monitor and/or control the content that their subscribers access or which websites they visit.

116. Upon information and belief, Defendants have the ability to determine whether their subscriber's service is being used for operating file-sharing programs such as BitTorrent and whether the subscriber's service is being used to distribute copies of copyright protected content.

**G) Defendants Do Not Have a Safe Harbor From Liability**

117. As part of the DMCA, Congress created a safe harbor that limits the liability of a service provider for copyright infringement when their involvement is limited to, among other things, "transmitting, routing, or providing connections for, material through a system or network

controlled or operated by or for the service provider." 17 U.S.C. § 512(a). To benefit from this safe harbor, however, an ISP must demonstrate that it "has adopted and reasonably implemented...a policy that provides for the termination in appropriate circumstances of subscribers...who are repeat infringers." 17 U.S.C. § 512(i)(1)(A).

118. Defendants have not adopted or reasonably implemented a policy of terminating repeat infringers.

119. Plaintiff's agent has sent numerous Notices to Defendants concerning infringements at IP addresses Defendants publish as assigned to them.

120. Likewise in the Parallel Proceeding, and demonstrating the extent of Defendants' knowledge, numerous Notices were sent to Defendants concerning infringements at IP addresses Defendants publish as assigned to them.

121. Defendants failed to terminate the accounts and/or take any meaningful actions against their subscribers in response to the Notices consistent with a reasonably implemented policy for termination of subscribers and account holders of the service provider's system or network who are repeat infringers necessary to support a safe harbor from liability ("policy").

122. Defendants specifically state in their policy that "RCN Telecom Services, LLC will terminate the subscriptions of repeat copyright infringers." *See* https://www.rcn.com/hub/about-rcn/policies-and-disclaimers/dmca-policy-and-procedure/ [last accessed December 22, 2023].

123. Below are examples of Defendants' failure to reasonably implement the requisite Policy.

124. Defendants failed to terminate the account and/or take any meaningful action against their subscriber at IP address 146.115.40.219 even after agents of plaintiffs in the Parallel Proceeding sent over 70 Notices.

125. Likewise, in the Parallel Proceeding, and demonstrating the extent of Defendants' knowledge and inaction, Defendants failed to terminate the account and/or take any meaningful action against their subscriber at IP address 65.78.99.191 even after agents of plaintiffs in the Parallel Proceeding sent 150 Notices.

126. Likewise, in the Parallel Proceeding, and demonstrating the extent of Defendants' knowledge and inaction, Defendants failed to terminate the account and/or take any meaningful action against v subscriber at IP address 207.172.202.107 even after agents of plaintiffs in the Parallel Proceeding sent over 140 Notices and Plaintiff's counsel sent a letter.

127. Likewise, in the Parallel Proceeding, and demonstrating the extent of Defendants' knowledge and inaction, Defendants failed to terminate the account and/or take any meaningful action against their subscriber at IP address 209.94.139.49 even after agents of plaintiffs in the Parallel Proceeding sent over 100 Notices and Plaintiff's counsel sent a letter.

128. Likewise, in the Parallel Proceeding, and demonstrating the extent of Defendants' knowledge and inaction, Defendants failed to terminate the account and/or take any meaningful action against their subscriber at IP address 209.150.44.177 even after agents of plaintiffs in the Parallel Proceeding sent over 90 Notices and Plaintiff's counsel sent a letter.

129. Likewise, in the Parallel Proceeding, and demonstrating the extent of Defendants' knowledge and inaction, Defendants failed to terminate the account and/or take any meaningful action against their subscriber at IP address 66.44.13.123 even after agents of plaintiffs in the Parallel Proceeding sent over 80 Notices and Plaintiff's counsel sent a letter.

130. Likewise, in the Parallel Proceeding, and demonstrating the extent of Defendants' knowledge and inaction, Defendants failed to terminate the account and/or take any meaningful action against their subscriber at IP address 216.80.112.90 even after agents of plaintiffs in the Parallel Proceeding sent

at least 80 Notices and Plaintiff's counsel sent a letter.

131.  Indeed, Defendants have failed to follow their own purported policy.

132.  Defendants' conduct renders them ineligible for safe harbor immunity from copyright liability under the DMCA.

**H) The Copyright Infringements Arise from Defendants' Advertisements**

133.  At all relevant times, Defendants' subscribers have paid substantial subscription fees for access to Defendants' high-speed Internet network.

134.  Defendants offer a tiered pricing structure so their subscribers can have even higher downloading and uploading speed for a higher monthly fee.  *See*, e.g., https://www.rcn.com/dc-metro/high-speed-internet/#shop,        which        redirects        to        https://www.astound.com/dc-metro/internet/#shop  [last accessed on December 22, 2023].



135. Defendants have advertised their highest tier for "gaming internet" and emphasize the high upload and download speeds for $60.00 with download speeds up to 1500 Mbps.

136. In March 5, 2020, as shown below, Defendants advertised the ability to use the highest tier of their service to "Download an HD movie in a Snap" and to "Download a TV show, an album or photos in a Flash". *See* Declaration of Joshua Lee in Parallel Proceeding, ECF No. 6 at ¶¶6-7.



137. Defendants' subscribers are motivated to become subscribers from Defendants' advertisements.

138. Defendants' subscribers are motivated to become subscribers from the knowledge of Defendants' practice of ignoring notices of infringements or failing to take any meaningful action.

**First Cause of Action**
**(Contributory Copyright Infringement based upon material contribution)**

139. Plaintiff re-alleges and incorporates by reference the allegations contained in each of the foregoing paragraphs.

140. Through their activities, Defendants knowingly and intentionally took steps that are substantially certain to result in direct infringement of Plaintiff's Copyrighted Works, and that have resulted in such direct infringement in violation of Plaintiff's copyrights.

141. Despite Defendants' knowledge that their subscribers were using their service to engage in widescale copyright infringements, Defendants have failed to take reasonable steps to minimize the infringing capabilities of their service.

142. Despite Defendants' knowledge that their subscribers were using their service to engage in widescale copyright infringements via BitTorrent a protocol, which is overwhelmingly used for piracy, Defendants have failed to take reasonable steps to minimize the infringing capabilities of their service.

143. Defendants are liable as contributory copyright infringers for the infringing acts of their subscribers.  Defendants have actual and constructive knowledge of the infringing activity of their subscribers.  Defendants knowingly caused and otherwise materially contributed to these unauthorized distributions of Plaintiff's Works.

144. Defendants' contributory infringements were committed "willfully" within the meaning of 17 U.S.C. § 504(c)(2).

145. By engaging in the contributory infringement alleged in this First Amended Complaint, Defendants deprived not only the producers of the Works from income that could have been derived when the respective film was shown in public theaters and offered for sale or rental, but also all persons involved in the production and marketing of this film, numerous owners of local theaters and retail outlets and their employees, and, ultimately, the local economy.  Defendants' misconduct therefore offends public policy.

146. Plaintiff is entitled to elect to recover from Defendants statutory damages for violations of

17 U.S.C. § 1202.

## Second Cause of Action
### (Vicarious Infringement)

147. Plaintiff re-alleges and incorporates by reference the allegations contained in each of the foregoing paragraphs.

148. Defendants are vicariously liable for the infringing acts of their subscribers' infringements including but not limited to their subscribers' direct infringements of Plaintiff's exclusive right to reproduce and distribute copies of its Works.

149. Defendants have the right and ability to supervise and control the infringing activities that occur through the use of their service, and at all relevant times has derived a direct financial benefit from the infringement of Plaintiff's copyrights.

150. Defendants have refused to take any meaningful action to prevent the widespread infringement by their subscribers. Indeed, the ability of subscribers to use Defendants' service to engage in widespread piracy of copyright protected content including Plaintiff's Works without having their services terminated despite multiple notices being sent to Defendants act as a powerful draw for subscribers of Defendants' service.

151. The ability of subscribers to use Defendants' high-speed service to infringe Plaintiff's Works without having their services terminated despite multiple notices being sent to Defendants acts as a powerful draw for subscribers of Defendants' service.

152. Defendants are therefore vicariously liable for the unauthorized reproduction and distribution of Plaintiff's Works.

**Third Cause of Action**

**(Secondary Liability for Digital Millennium Copyright Act Violations)**

153. Plaintiff re-alleges and incorporates by reference the allegations contained in each of the foregoing paragraphs.

154. Defendants' subscribers knowingly and with the intent to induce, enable, facilitate, or conceal infringement of the Plaintiff's copyright protected Works, distributed copyright management information ("CMI") that falsely included wording such as "YTS" and "RARBG" in violation of 17 U.S.C. § 1202(a)(2).

155. Defendants' subscribers knowingly and with the intent to induce, enable, facilitate, or conceal infringement of the copyright protected Works distributed CMI that falsely included the wording such as "YTS" and "RARBG" or in violation of 17 U.S.C. § 1202(a)(2).

156. Defendants' subscribers knowingly and with the intent to induce, enable, facilitate, or conceal infringement of the copyright protected Works distributed CMI that falsely included the wording such as "YTS" and "RARBG" in violation of 17 U.S.C. § 1202(a)(2).

157. Defendants' subscribers, without the authority of Plaintiff or the law, distributed removed or altered CMI knowing that the CMI had been removed or altered to include wording such as "RARBG" and "YTS" without the authority of the Plaintiff and knowing, or having reasonable grounds to know, that it will induce, enable, facilitate, or conceal infringement of Plaintiff's Copyright protected Works in violation of 17 U.S.C. § 1202(b)(2).

158. Defendants' subscribers, without the authority of Plaintiff or the law, distributed Plaintiff's Copyright protected Works knowing that the CMI had been removed or altered to include wording such as "RARBG" or "YTS", and knowing, or having reasonable grounds to know, that it will induce, enable, facilitate, or conceal infringement of the copyright protected Works in violation of 17 U.S.C. § 1202(b)(3).

159. Particularly, Defendants' subscribers knew that the CMI in the file names of the pieces of the Work had been altered to include wording such as "RARBG", "YTS" or "FGT".

160. Particularly, Defendants' subscribers distributed the file names that included CMI that had been altered to include the wording "YTS" or "RARBG".

161. Defendants' subscribers knew that the wording "YTS" or "FGT" originated from notorious movie piracy website.

162. Defendants' subscribers' acts constitute violations under the Digital Millennium Copyright Act ("DMCA violation"), 17 U.S.C. § 1202.

163. Through their conduct, Defendants knowingly and intentionally induced, enticed, persuaded, and caused their subscribers to constitute DMCA violations.

164. Through their activities, Defendants knowingly and intentionally take or took steps that are substantially certain to result in their subscribers committing DMCA violations, and that have resulted in DMCA violations.

165. Despite Defendants' knowledge that their subscribers use their service to commit DMCA violations, Defendants have failed to take reasonable steps to minimize the capabilities of their service to facilitate DMCA violation.

166. Defendants are secondarily liable for the DMCA violations of their subscribers. Defendants have actual and constructive knowledge of their subscribers' DMCA violations. Defendant knowingly caused and otherwise materially contributed to these DMCA violations.

167. Defendants are vicariously liable for the DMCA violations of their subscribers. Defendants have the right and ability to supervise and control the DMCA violations that occur through the use of their service, and at all relevant times have derived a direct financial benefit from the DMCA violations complained of herein.  Defendants have refused to take any meaningful

action to prevent the widespread DMCA violations by their subscribers.  Indeed, the ability of Defendants' subscribers to use Defendants' service to engage in widespread DMCA violations while pirating content without having their services terminated despite multiple notices being sent to Defendants acts as a powerful draw for subscribers of Defendants' service.  Defendants are therefore vicariously liable for the DMCA violations.

168. Plaintiff is entitled to an injunction to prevent Defendants from engaging in and/or contributing to further violations of 17 U.S.C. § 1202.

169. Plaintiff is entitled to recover from Defendants the actual damages suffered by Plaintiff and any profits Defendants have obtained as a result of their wrongful acts that are not taken into account in computing the actual damages. Plaintiff is currently unable to ascertain the full extent of the profits Defendants have realized by their violations of 17 U.S.C. § 1202.

170. Plaintiff is entitled to elect to recover from Defendants statutory damages for their violations of 17 U.S.C. § 1202.

171. Plaintiff is further entitled to costs and reasonable attorneys' fees.

### Prayer for Relief

WHEREFORE, Plaintiff respectfully requests that this Court:

(A) enter permanent injunctions enjoining Defendants from continuing to contribute to infringements of the Plaintiff's copyrighted Works and DMCA violations;

(B) order Defendants to adopt a policy that provides for the prompt termination of subscribers for which Defendants receive more than three unique notices of infringements of copyright protected Works within 72 hours without receiving a counter notification from said subscriber;

(C) order Defendants to block subscribers from accessing notorious piracy websites of foreign origin including but not limited to: (a) YTS; (b) Piratebay; (c) Rarbg; and (d) 1337x and (e) TorrentGalaxy that are listed in the annual trade report of Notorious Foreign Markets published by the United States Government on all networks under their control to prevent further pirating of Plaintiff's Works via the BitTorrent protocol pursuant to 17 U.S.C. §§ 512(j)(1)(A) and (B);

(D) order Defendants to disclose to Plaintiff the identifications of the subscribers who used and use Defendants' service to infringe Plaintiff's Works on an ongoing basis after said subscribers are provided notice as required by 47 U.S.C. § 551;

(E) award the Plaintiff its actual damages from the copyright infringements and Defendants' profits in such amount as may be found; alternatively, at Plaintiff's election, award Plaintiff its maximum statutory damages of $150,000 per infringement pursuant to 17 U.S.C. § 504(a) and (c) against Defendants jointly and severally;

(F) award the Plaintiff its actual damages from the DMCA violations and Defendants' profits in such amount as may be found; or, in the alternative, at Plaintiff's election, for maximum statutory damages of $25,000 for each DMCA violation pursuant to 17 U.S.C. § 1203(c) for violating 17 U.S.C. § 1202;

(G) award the Plaintiff its reasonable attorneys' fees and costs pursuant to 17 U.S.C. §§ 505 and 1203(b)(5); and

(H) grant the Plaintiff any and all other and further relief that this Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands

a jury trial on any issue that is triable of right by a jury.

Dated: December 27, 2023

By:_____

**SAIBER LLC**
James H. Forte (jforte@saiber.com)
Jakob B. Halpern (jhalpern@saiber.com)
18 Columbia Turnpike, Suite 200
Florham Park, NJ 07932
T: (973) 622-3333
Attorneys for Plaintiff

**FOLEY & LARDNER LLP**
Jonathan Moskin (jmoskin@foley.com)
Roma Patel (rlopes@foley.com)
90 Park Ave
New York, NY 10016
Telephone:     (212) 338-3572
Pro Hac Vice Counsel for Plaintiff

**CULPEPPER IP, LLC**
Kerry S. Culpepper,
kculpepper@culpepperip.com
75-170 Hualalai Road, Suite B204
Kailua-Kona, Hawaii 96740
Telephone:     (808) 464-4047
Pro Hac Vice Counsel for Plaintiff

## CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2

I hereby certify that the matter in controversy is not, to the best of my knowledge, the subject of any other action pending in any court, or of any pending arbitration or administration proceeding, although the Parallel Proceeding defined in paragraph 1 of the Complaint involves common issues of fact and law.

Dated:  December 27, 2023

_____
JAMES H. FORTE

## CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 201.1

I hereby certify that this action should not be designated or processed for compulsory arbitration because the Complaint seeks damages that exceed the sum of $150,000, exclusive of interest and costs and any claim for punitive damages, and also seeks injunctive relief.

_____
JAMES N. FORTE

Dated:  December 27, 2023